UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                            :
IN RE COUDERT BROTHERS,                                     :
                                                            :                11 Civ. 4949 (PAE)
                                   Debtor.                  :
                                                            :
------------------------------------------------------------------------:                OPINION & ORDER
                                                            :
DEVELOPMENT SPECIALISTS, INC., *in its capacity as*        :
*Plan Administrator for Coudert Brothers LLP*,             :
                                                            :
                                   Plaintiff,               :
                                                            :
                         -v-                                :
                                                            :
PEABODY ENERGY CORPORATION et al.,                         :
                                                            :
                                   Defendants.              :
                                                            :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      This case involves a dispute over lobbying work done, first by the law firm of Coudert

Brothers LLP ("Coudert"), and later, after Coudert's bankruptcy, by the law firm of Baker &

McKenzie LLP ("Baker").  This lobbying, done on behalf of various American coal companies,

ultimately helped secure an act of Congress that resulted in substantial tax refunds for these

companies.  In this lawsuit, which arises out of Coudert's bankruptcy proceedings, plaintiff

Development Specialists, Inc., the Plan Administrator in Coudert's bankruptcy, claims that such

lobbying by Coudert and Baker was done on behalf, and with the consent, of defendants Peabody

Energy Corporation, Peabody Holding Company, Inc., and Peabody Holding Company, LLC

(collectively, "Peabody"), but that Peabody did not compensate the law firms for their lobbying

work.  The Plan Administrator brings contract and quasi-contract claims.

Peabody now moves for summary judgment on both claims.  For the reasons that follow, Peabody's motion is granted as to the contract claim, and denied as to the quasi-contract claims.

## I.      Background[1]

### A.  Overview

In 1997, Peabody, a major coal company, retained Coudert to seek refunds of millions of dollars of taxes that Peabody had paid on coal exports.  On its face, the parties' written engagement agreement refers to seeking refunds only by means of litigation, and between 1997 and 2003, Coudert's work on behalf of Peabody was limited to litigation.  Coudert's litigation efforts were partially successful:  It obtained refunds of taxes that Peabody paid covering the years 1994 to 1997, but not for earlier years.  Pursuant to the engagement agreement, Coudert received a fee for these services.  That fee is not at issue here.

This case concerns the next step in Coudert's efforts—and, after Coudert dissolved in 2005 and some of its partners moved to Baker, Baker's efforts—to obtain refunds for Peabody and other coal companies.  In 2003, although it continued to pursue litigation, Coudert broadened its strategy to include lobbying Congress to pass legislation that would give coal companies the

---

[1] The facts which form the basis of this Opinion and Order are taken from the parties' pleadings and their submissions in support of and in opposition to the instant motion—specifically, the Declaration of Robert A. Scher in Support of Defendants' Motion for Summary Judgment ("Scher Decl.") (Dkt. 37), and attached exhibits; the Affidavit of Steven H. Becker in Opposition to Defendants' Motion for Summary Judgment ("Becker Decl.") (Dkt. 39), and attached exhibits; the Declaration of Eric W. Wiechmann in Opposition to Defendants' Motion for Summary Judgment ("Wiechmann Decl.") (Dkt. 40), and attached exhibits; the Declaration of Marc Dorfman in Support of Defendants' Motion for Summary Judgment ("Dorfman Decl.") (Dkt. 46); Defendants' Local Rule 56.1 Statement of Material Fact ("Def. 56.1") (Dkt. 31); Plaintiff's Local Rule 56.1 Statement of Material Fact ("Pl. 56.1") (Dkt. 42); and Defendants' Reply to Plaintiff's Local Rule 56.1 Statement of Material Fact ("Def. Reply 56.1") (Dkt. 44).  References herein to a paragraph in a party's 56.1 statement incorporate by reference the evidentiary materials cited in that paragraph.  Facts which are not "specifically controverted by a correspondingly numbered paragraph" in a counterstatement are deemed to be admitted, pursuant to S.D.N.Y. Local Civil Rule 56.1.  Facts in dispute are so noted.

refunds they desired.  Between 2003 and 2008, Coudert and Baker performed substantial

lobbying activities.  These activities culminated in legislation, passed by Congress in 2008, that

effectively granted refunds to coal companies on excise taxes paid between 1991 and 1994.

Peabody's refund was approximately $59 million.

It is undisputed that Coudert and Baker did substantial lobbying work in furtherance of

legislation that resulted in these substantial refunds.  The dispute in this case is whether that

work was performed *on behalf of* Peabody, and if so, whether that work was performed, and

should be compensated, pursuant to the 1997 engagement letter, which provided for Coudert

(later Baker) to receive a 15% contingency fee in the event of a successful outcome.  The Plan

Administrator here, which stands in the shoes of Coudert and Baker, argues that the engagement

agreement encompasses lobbying, and that, in any event, Coudert and Baker deserve

compensation, because they were working on Peabody's behalf and Peabody knowingly

accepted the fruits of their labor.  For its part, Peabody denies that the terms of the engagement

agreement cover lobbying.  It further argues that Peabody did its own lobbying work, and did not

retain Coudert and Baker to do it; that any lobbying by Coudert and Baker was exclusively on

behalf of the *other* coal companies they represented; and that Coudert's and Baker's

communications with Peabody during the lobbying process were solely to coordinate their

parallel efforts and do not reflect a retention by Peabody of these firms to lobby.

With that overview, the Court proceeds to a more detailed review of the parties and

relevant events.

**B.  The Parties**

Between 1991 and 1997, Peabody paid millions of dollars in excise taxes on coal exports, pursuant to 26 U.S.C. §§ 4121(a)(1), 4221(a) (the "black lung excise tax" or "BLET").  Pl. 56.1 ¶¶ 1–2; Def. 56.1 ¶¶ 1–2.

In 1997, Peabody retained Coudert to seek refunds of those excise taxes, pursuant to an engagement agreement described below.  Until 2005, Coudert performed under that agreement. In August 2005, however, Coudert's partners voted to dissolve the firm's business and began selling off the firm's assets.  Pl. 56.1 ¶ 33; Def. 56.1 ¶ 33.  In September 2005, Coudert sold a number of its assets to Baker.  These included Coudert's rights under the engagement agreement at issue here.  Pl. 56.1 ¶¶ 35–36; Def. 56.1 ¶¶ 35–36.  Contemporaneously, the partner who had led Coudert's work for Peabody, Steven H. Becker, Esq., joined Baker, along with other Coudert lawyers.  Baker thereafter continued to perform under the agreement.

Plaintiff Development Specialists is the court-appointed Plan Administrator in Coudert's bankruptcy.  Under an agreement with the Plan Administrator, Baker has assigned to the bankruptcy estate its right to pursue contingent fee claims against Peabody.  Under the terms of that agreement, Baker would receive a capped 50% share of the Plan Administrator's net recovery, after fees and costs.  Pl. 56.1 ¶ 85; Def. 56.1 ¶ 85.  Thus, the bankruptcy estate is the assignee of Baker's right to fees for work performed by Baker and Coudert.  For ease of reference, the Court will refer to Coudert and Baker, when described collectively, as Baker.

**C.  The 1997 Engagement Agreement**

On April 16, 1997, Coudert and Peabody entered into the engagement agreement that is the focus of the Plan Administrator's contract claim (the "Agreement").  The Agreement takes

4

the form of a letter from Becker[2] to Jeffrey L. Klinger, Esq., Peabody's Vice President and Chief

Legal Officer.  Scher Decl. Ex. A ("Agreement").  Becker and Klinger signed the Agreement.

*Id.*

> The Agreement is headed "Constitutional Challenge to Coal Excise Tax."  *Id.*  It begins:

> This will confirm our conversation concerning our proposed representation of
> [Peabody] in its efforts to obtain refunds and/or savings [] of excise taxes paid by
> it upon sale of coal for exportation.  This representation may include applying to
> the Internal Revenue Service for refund and abatement of the excise tax, filing
> suit against the United States in the U.S. Court of Federal Claims, and whatever
> other action before the IRS, or in the federal trial or appellate courts, we may
> deem necessary or advisable in order to obtain and maximize the refunds being
> sought.

*Id.*  The Agreement nowhere refers to lobbying work.

> In addition to its header and these introductory sentences, the Agreement contains other

provisions referencing the courts or litigation:

- It provides that Coudert's fee for its services will be 15% of the gross
  refunds obtained by Peabody, and that this amount would be calculated
  "based upon total refunds . . . of all excise taxes applicable to Peabody's
  shipments prior to a final favorable decision by the IRS or the courts and
  in accordance with such final favorable decision."  *Id.*

- It states that "[Coudert] do[es] not expect to incur disbursements beyond
  normal photocopying, telecommunications, and filing fees in court."  *Id.*

- It provides that if Peabody decides to cease its pursuit of refunds, it may
  instruct Coudert "to seek settlement, and/or the withdrawal of any and all
  claims and/or cessation of any litigation."  *Id.*

> Klinger testified that, at the time he signed the Agreement, he did not intend or expect

that Coudert's work would encompass lobbying.  Scher Decl. Ex. C ("Klinger Dep.") at 78.

Becker testified to the same effect.  Scher Decl. Ex. B ("Becker Dep.") at 25 ("I don't recall, at

the time this agreement was entered into, thinking about lobbying.").  In an affidavit opposing

---

[2] Pursuant to an April 2011 agreement, Becker is entitled to receive 65% of Baker's share of the
recovery in this case.  Pl. 56.1 ¶ 86; Def. 56.1 ¶ 86.

Peabody's motion for summary judgment, however, Becker sought to present his views in a different light. He attested: "I can state that both parties understood that the particular services to be preformed [sic] by Coudert were secondary to the primary purpose of the Engagement Letter, which was to represent Peabody in its efforts to obtain refunds, and that if Peabody got refunds, Coudert was to receive its fee." Becker Decl. ¶ 25. Regardless, it is undisputed that, at the time that the Agreement was signed, Becker was not a lobbyist, and had never been one. *See* Becker Dep. 22–24; *see also* Dkt. 50–51.[3]

There is no document that explicitly amends, or purports to amend, the Agreement. Becker Dep. 19–21. Nor has any witness testified that the parties explicitly agreed, orally, to amend the Agreement. The parties, however, vigorously dispute whether their course of conduct implicitly amended or modified the Agreement. *See, e.g.*, Pl. 56.1 ¶¶ 13–14; Def. 56.1 ¶¶ 13–14; *see also* Part III(A)(2), *infra*.

**D. Litigation Efforts**

Coudert's litigation proceeded on two fronts. First, in 1997, Coudert filed refund claims with the IRS, arguing that the black lung excise tax was unconstitutional. Because the statute of limitations for such claims was three years, Coudert sought refunds for taxes paid by Peabody during the previous three years, *i.e.*, dating back to 1994. Second, also in 1997, Coudert sued the United States in the U.S. Court of Federal Claims under the Tucker Act, on behalf of Peabody and other coal companies. That action sought to recover the excise taxes paid on exported coal during the preceding six years. Pl. 56.1 ¶¶ 15–18; Def. 56.1 ¶¶ 15–18.

---

[3] On January 3, 2013, the Court issued an order directing the parties to submit post-argument letters addressing whether, based on the record evidence, Becker, in 1997 was, or ever had been, a lobbyist. In their letter responses, the parties agree that, as of 1997, Becker was not and had never been a lobbyist. *See* Dkt. 50–51.

In 1998, other coal companies, represented by other counsel, won a lawsuit challenging the black lung excise tax as unconstitutional as applied to domestically produced coal sold for import.  *See Ranger Fuel Corp. v. United States*, 33 F. Supp. 2d 466, 469 (E.D. Va. 1998).  The United States did not appeal the *Ranger Fuel* decision; on May 20, 2000, the IRS acquiesced in it.  Pl. 56.1 ¶¶ 20–22; Def. 56.1 ¶¶ 20–22.  Coudert thereafter assisted Peabody in obtaining refunds pursuant to that decision.  Coudert's work included filing refund claims with the IRS and representing Peabody in a contentious audit regarding its entitlement to a refund.  Pl. 56.1 ¶¶ 23–24; Def. 56.1 ¶¶ 23–24; Becker Dep. 32.  Coudert successfully obtained refunds for Peabody, and Peabody paid Coudert its share of these refunds under the Agreement.  Pl. 56.1 ¶¶ 25–30; Def. 56.1 ¶¶ 25–30.  The payment of that fee is not in dispute here.

Because the refunds obtained pursuant to the *Ranger Fuel* decision concerned only taxes paid in or after 1994, Coudert continued working to obtain refunds for Peabody for taxes paid before 1994.  In early 1999, the Court of Federal Claims had dismissed Coudert's Tucker Act lawsuit, but, in March 2000, the Federal Circuit Court of Appeals overturned that dismissal.  *See Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369 (Fed. Cir. 2000).  In July 2004, on remand, the Court of Federal Claims ruled that the Tucker Act would allow refunds dating back six years from the date litigation was filed, *i.e.*, to 1991.  *See Andalex Resources, Inc. et al. v. United States*, No. 00-cv-249 (Ct. Cl. July 21, 2004).

In September 2005, after Coudert dissolved, Becker joined Baker as a partner, and continued to pursue the litigation on behalf of Peabody.  Scher Decl. Ex. G.  The parties do not dispute that Becker's litigation work for Peabody was subject to the engagement agreement.

In 2007, the Federal Circuit affirmed the ruling in Peabody's favor.  *See Clintwood Elkhorn Mining Co. v. United States*, 473 F.3d 1373, 1374 (Fed. Cir. 2007).  However, on April

15, 2008, the Supreme Court reversed.  It held that taxpayers must file a timely refund claim with the IRS to take advantage of the Tucker Act's longer limitations period.  *See United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 6 (2008).  With that decision, Coudert and Baker's attempts, by means of litigation, to obtain refunds for Peabody for taxes paid between 1991 and 1994 ended, unsuccessful.

### E.  Lobbying Efforts

The parties agree that Coudert's lobbying efforts in support of refunds began sometime in 2003.  The earliest record evidence of lobbying work by Coudert is a September 17, 2003 time entry by Becker, indicating that he had had a phone conference with Klinger, Peabody's chief legal officer, "regarding Bunning bill."  Becker Decl. Ex. D at 000130.  Ensuing time entries indicate that Becker and other Coudert attorneys, Paul Horowitz and Susan Offerman, continued lobbying work up until Coudert's dissolution in August 2005.  *Id.* at 000130–61.  Following their transfer to Baker, Becker, Horowitz ,and Offerman continued to make time entries reflecting additional lobbying work.  These entries continue until October 2008, when Congress passed the legislation that ultimately secured the tax refunds for the coal companies that litigation had failed to achieve.  *Id.* at 00559–650.  The time entries by Becker, Horowitz, and Offerman were recorded on billing records that list Peabody as the client.  Significantly, at argument, counsel for Peabody represented that these records were never sent to Peabody, *see* Transcript of December 18, 2012 Oral Argument ("Tr.") at 16–17, and there is no record evidence that Peabody was aware of them before this litigation.

On November 16, 2005, a legal assistant at Baker emailed Jeffrey Maher, an accountant at Peabody, requesting information "[i]n order to complete the lobbying registration form for Peabody."  Becker Decl. Ex. E at 0007216.  The next day, Maher sent the requested information

to Offerman.  *Id.* at 0007214.  On November 22, 2005, Offerman emailed the completed

lobbying form to Maher for his review, under the subject "Peabody Lobbying Form – Davis

Bill."  *Id.* at 0007219.

On February 14, 2006, Baker first filed a lobbying disclosure form listing Peabody as a

client.  Scher Decl. Ex. R.  That form covered the second half of 2005.  It indicated that Baker's

income relating to lobbying activities during that period was less than $10,000.  *Id.*  On the form,

Baker specified that its lobbying activities entailed advocating for legislation seeking refunds of

coal excise taxes.  *Id.*  In 2006 and 2007, Baker filed similar semi-annual forms; in 2008, it filed

similar quarterly forms.  *Id.*  Each form listed similar lobbying activities; each semi-annual form

indicated that Baker's income from those activities had been less than $10,000 in the relevant

period, and each quarterly form reported less than $5,000 income.  *Id.*  On December 10, 2008,

Baker filed the last such form, which covered fourth quarter 2008.  *Id.*

On January 17, 2006, Becker emailed Klinger and Frederick Palmer, Peabody's Senior

Vice President for Government Relations.[4]  The email asked about Peabody's position on the

"Emerald Bill"—a bill being pursued by another coal company, Emerald, and its lawyer, Marc

Hebert.  Scher Decl. Ex. J.  Palmer replied, "[p]lease call to discuss."  *Id.*

The following day, January 18, 2006, Palmer and Becker spoke on the phone.  Their

accounts of that conversation differ.  Palmer testified that he made very clear to Becker that

Palmer was directing Peabody's lobbying efforts, and that Becker was not representing Peabody

in connection with lobbying work.  Palmer Dep. 33–35, 44–45; *see id.* at 44 ("[I made] it very

clear to Steve Becker that we were elevating our profile in Washington and this was—from

---

[4] Palmer was Peabody's most senior employee in legal and government relations.  Scher Decl.
Ex. D ("Palmer Dep.") at 6.  Klinger had headed the legal department before 2001, when Palmer
joined Peabody, but after Palmer's arrival, Klinger reported to him.  *Id.* at 6, 17.  Palmer testified
that he had not known that Baker had ever registered as a lobbyist for Peabody.  *Id.* at 34.

Peabody's standpoint I was representing Peabody with my team.  Happy to work with the group that he was involved with going forward, but that he was not representing me and Peabody."). Becker testified that he does not recall Palmer making any such statement in the conversation. Becker Dep. 102 ("Q.  Do you agree, Mr. Becker, that Mr. Palmer told you that Peabody ran its own lobbying operations in Washington?  A. [H]e didn't tell me that insofar as to convey a message that we were not lobbying for Peabody, if that's what you're suggesting. . . .  I don't recall him making that statement.").

Also on January 18, 2006, Becker emailed Palmer to "confirm[] the understanding that I conveyed to you this morning, namely that a vehicle [for the Emerald Bill] has not been identified yet."   Becker Decl. Ex. E at 0007230.  Hebert had planned a series of meetings with congressional staffers regarding the Emerald Bill.  Referring to those meetings, Becker's email to Palmer stated:  "It appears that Emerald and Hebert were and are hoping for support at those meeting from Peabody, Consol and Arch [other coal companies], without which they don't believe the Emerald bill has much chance of progressing.  Please advise us of Peabody's plans in this regard."  *Id.*  Becker also wrote that he would send Palmer the schedule for these meetings. *Id.*  On January 19, 2006, Palmer replied:  "Peabody supports your efforts and you may so state. In the future, please let me have more notice on anticipated meetings and keep me informed in real time of your discussions and progress."  *Id.*

Shortly thereafter, Becker emailed Palmer reporting on the first meeting with congressional staffers.  *Id.* at 0007233.  Of that meeting, Becker wrote:

> [The staffers] asked for us to get from Peabody and the other producers letters, to Sen. Rockefeller and others, expressing support for the Emerald Bill.  They also asked that the lobbyists for these companies contact them to coordinate further the lobbying efforts.

> In this regard, please let me know who is replacing Dan Scherder[5], so that we
> can get him up to speed and engaged in this effort.

*Id.* Palmer replied: "Thanks. Senator (former) Tim Hutchinson will be your contact. . . . He is
aware of the assignment but not of the substance. A memo from you to me would be helpful, I
will then discuss with Tim and you all can proceed from there." *Id.*

On January 26, 2006, Becker sent Palmer the requested memo, as well as a draft of the
Emerald Bill. *Id.* at 0007237–47. In addition to providing a detailed history of Baker's litigation
efforts, Becker's memo outlined the history of the Emerald Bill. It stated that, in its initial form,
the bill would have provided refunds only to coal brokers, such as Emerald; as a result, coal
producers, such as Peabody, initially opposed the bill. However, Becker's memo stated, Emerald
had approached Becker in 2005, and their discussion "led to the drafting of a bill that would give
producers something in return." *Id.* at 0007242. Becker's memo went on to describe Becker and
Hebert's recent meeting with congressional staffers. The memo stated that "[t]he next step, at
least as advocated by Hebert and by the staffers, is for the major producers to sign on to a letter
to Senator Bunning . . . expressing strong support for the bill." *Id.*

The following day, January 27, 2006, Becker emailed Palmer a draft letter to Senator
Bunning, expressing support for the bill. *Id.* at 0007249. On January 31, 2006, Palmer replied:
"Peabody is fine with the letter and I will sign it." *Id.* at 0007253. On March 8, 2006, after
several iterations of the draft had been circulated, Palmer signed the letter. Becker Decl. Ex. G
at 0007283.

On October 24, 2006, Peabody's Klinger emailed Becker and Horowitz requesting "a
memo on the status of the principal and interest appeals and the probability of success on each

---

5 Dan Scherder had previously worked in a consulting capacity for Peabody, but the relationship
ended in 2006. Palmer Dep. 17–20.

appeal." Scher Decl. Ex. L.  Although Klinger's email referred only to litigation, Becker's

response also addressed lobbying:  "[W]e are proceeding on two fronts, judicial and legislative."

*Id.*  Becker explained that a bill had been introduced in the House and Senate that would

"confirm Peabody's entitlement to both principal and interest, and allow Peabody to reach back

an extra two or three quarters."  *Id.*  The record does not indicate whether Klinger responded.

On March 7, 2007, Becker emailed Christopher Leahy, Peabody's Vice President of

Federal Government Relations.[6]  Becker's email read:  "You may recall that a week or two ago I

asked your guidance as to what continuing role, if any, did Peabody feel comfortable in having

us at Baker play in the lobbying process.  Please let us know, so that I can advise the other

parties if we must bow out of this process."  Scher Decl. Ex. M at 000907.  Five minutes later,

Becker sent another email to Leahy, adding:  "By the way, since our call, Baker has not been

actively involved in the lobbying, but I expect that the other parties are soon going to ask us to

get involved.  Hence our need to get your instructions if the reumption [sic] of our lobbying for

the bill causes a problem for Peabody."  *Id.* at 000906.

On March 11, 2007, Leahy responded:  "You are free to represent the other coal

companies but not Peabody regarding this issue.  Peabody is neutral on this bill, and it is not a

legislative priority for us at this time."  *Id.*

On January 30, 2008, Baker's Offerman emailed Klinger requesting updated information

about the various Peabody entities for which Baker had previously reported lobbying activities.

Offerman also asked Klinger to provide "the name of any other [Peabody] affiliates . . . that will

benefit from the BLET refunds, should our lobbying effort succeed."  Becker Decl. Ex. E at

0007327.  Minutes later, Klinger replied with the requested information.  *Id.* at 0007138.

---

[6] In 2006, Peabody hired Leahy to serve as its chief in-house lobbyist in Washington, working
under Palmer.  Palmer Dep. 19.

On February 3, 2008, Becker emailed Leahy, Peabody's in-house lobbyist, expressing

concern that Senator Jon Kyl had spoken negatively about the proposed coal excise tax refund

legislation: "I am worried about Kyl, and am wondering whether Peabody has contacted him or

would be willing to try."  Becker Decl. Ex. E at 0007333.  On February 4, 2008, former senator

Hutchinson, serving as Peabody's outside lobbyist, emailed Leahy, raising similar concerns:  "If

there are additional arguments on this that I can get to [Kyl's chief of staff], send them on.  As

you know, Kyl has not spoken well of the pkg.  So, we need to frame this for a hard

conservative.  Fairness and stimulas [sic] through investment etc."  *Id.* at 0007334.  Leahy

forwarded Hutchinson's email to Becker, writing "pls assist."  *Id.*  Shortly thereafter, Becker

responded to Leahy and Hutchinson with an email outlining arguments why the legislation was

fair.  *Id.* at 0007347.

On February 11, 2008, Becker emailed Klinger, stating:

As you know, for some time we have been working on the language of a bill in
Congress which if passed would refund [black lung excise taxes] paid since fourth
quarter 1990, plus interest. . . .  It appears that there is an opportunity to have our
BLET bill included in an energy package . . . .

We want to inform you that our firm represents clients in the petroleum industry
which would likely be adversely affected by the passage of the energy package.
However, as I am not aware that our representation of those clients involves us in
opposing the energy package, it should not impair our judgment or divide our
loyalty and commitment to Peabody's interests in getting the energy package
passed.

Assuming you agree, kindly let me know by return email that you consent to our
working on getting the BLET bill . . . passed.

*Id.* at 0007131.  Klinger never responded to the email.  Becker Dep. 95, 97; Pl. 56.1 ¶ 61; Def.

56.1 ¶ 61.

On March 5, 2008, Becker emailed a group of coal company employees and

representatives, including Leahy and Palmer, to address the interplay between the pending

legislation and the upcoming Supreme Court argument in *Clintwood Elkhorn*.  Becker Decl. Ex.

E at 0007354.  His email explained that "[i]f [congressional] staff asks whether the passage of

the [bill] would render the Supreme Court case moot, the answer is no, it should not."  *Id.*

The bill had not passed by April 15, 2008, when the Supreme Court issued its decision in

*Clintwood Elkhorn*.  Three days later, on April 18, 2008, Palmer sent Becker an email, stating:

"To be clear here, this legislative effort is completely separate from the litigation.  The Supreme

Court decision has become a problem and impediment, but our Washington effort will proceed

anyway with no additional resources needed nor requested."  Scher Decl. Ex. P.

The same day, Becker forwarded the email to his partner, Horowitz, copying himself, and

wrote:

> To Paul and File:
>
> As I just reported to you, I spoke with Jeff Klinger who told me that [Palmer's] email was the first time he became aware of the matter, and he did not know what prompted the email.
>
> I then called [Palmer], who didn't want to talk, saying in essence that his email was sufficient. . . . I also explained that the legislative strategy was something we devised as a back-up to the litigation.  He then said the legislative strategy wasn't working, and that he regards the legislative strategy as separate from the litigation which is concluded.  I told him that I disagreed, and that the legislative work we have performed over the past three years . . . was very much connected to the litigation.
>
> [Palmer] made reference to Peabody's intention . . . to pursue some new legislative or other strategy.  He wouldn't say what the other strategy would be.
>
> I explained to [Palmer] that aside from Peabody, we have several other coal clients for which we want to continue to work on the legislation – he said that was fine with him. . . . He also commented that he hopes the current legislative effort succeeds.

*Id.* Becker testified that he viewed Palmer's remarks on the call "as an attempt by Peabody to avoid paying Baker its contingent fee after the many years of work we had done for them." Becker Decl. ¶ 28.

On October 3, 2008, Congress passed the Energy Improvement and Extension Act ("EIEA"). It authorized payment of otherwise time-barred refunds of coal excise taxes, but required that taxpayers file a refund claim with the IRS. Notwithstanding its disagreement with Becker over whether Baker was entitled to a contingency fee for its lobbying work in support of the legislation ultimately enacted as the EIEA, Peabody decided to "bury the hatchet" with Becker, *see* Wiechmann Decl. Ex. 7, and retained Baker on an hourly basis to represent Peabody in obtaining these refunds from the IRS, *see* Scher Decl. Ex. T. Peabody and Baker entered into this agreement, however, on the mutual understanding that it would not affect their respective positions on the dispute over the contingency fee. *See* Wiechmann Decl. Exs. 7–8. Becker and his team were paid $77,428.21 for their post-EIEA work to secure the refunds. Becker Dep. 137.

In 2009, Peabody received approximately $59 million in refunds of excise taxes and interest, pursuant to the EIEA. Becker Decl. Ex. I.

On January 29, 2010, in connection with the audit of Peabody's 2009 financial statements, Peabody sent a letter to Baker. It asked that Baker "inform Ernst & Young of the amount of unpaid (billed or unbilled) legal fees, if any, for services rendered by you to the Company as of December 31, 2009." Scher Decl. Ex. U at 00011951. On February 17, 2010, Baker responded: "As of December 31, 2009, the Company had statements from our firm for legal fees and expenses in the amount of $840,933.07. These statements have not been paid. Unbilled fees amounted to $191,961.29." *Id.* at 00011949. Baker's response recites various limitations, however. These include that Baker's response is "limited to those matters which the

Company has referred to us for legal representation . . . and with respect to which we have given substantive attention subsequent to December 31, 2008." *Id.* at 00011946.

### F. Procedural History

In May 2011, the Plan Administrator filed this adversary proceeding in bankruptcy court. On July 19, 2011, Peabody moved to withdraw the bankruptcy reference. Dkt. 1. On November 22, 2011, this Court granted that motion, upon the resolution of Peabody's then-pending motion to dismiss before the Hon. Robert D. Drain, United States Bankruptcy Judge. Dkt. 13. On November 28, 2011, the Court was notified that Judge Drain had resolved the motion,[7] and on November 30, 2011, it withdrew the reference to the bankruptcy court. Dkt. 14.

On January 4, 2012, the Plan Administrator filed its first amended adversary complaint. Dkt. 25. On September 13, 2012, Peabody moved for summary judgment. Dkt. 35–37. On November 5, 2012, the Plan Administrator filed an opposition. Dkt. 39–42. On November 20, 2012, Peabody filed a reply. Dkt. 44–46. On December 18, 2012, the Court held oral argument.

## II.    Applicable Legal Standards

Summary judgment is merited only where the submissions, taken together, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts "in the light most favorable" to the non-movant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008). To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing

---

[7] Judge Drain granted Peabody's motion in part and denied it in part. As relevant here, he denied Peabody's motion to dismiss the Plan Administrator's breach of contract claim, but granted the motion to dismiss its quasi-contract claims, without prejudice, with leave to file an amended complaint asserting these claims.

to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.   Discussion

Peabody moves for summary judgment on both the Plan Administrator's contract and quasi-contract claims.  The Court addresses these claims in turn.

### A.  Contract Claim

It is undisputed that, if the Agreement contemplated lobbying work by Coudert (later Baker), Peabody is in breach for not paying Baker following its receipt of tax refunds for the years 1991–1994.  The parties vigorously dispute the proper interpretation of the Agreement. Peabody argues that the Agreement unambiguously does not reach lobbying, and that, even if there were some ambiguity on that point, the extrinsic evidence overwhelmingly shows that the parties did not intend the Agreement to reach it.  The Plan Administrator counters that the Agreement is ambiguous with regard to lobbying and that there is sufficient extrinsic evidence to establish a triable issue of fact as to the parties' intentions on that point.  The Plan Administrator alternatively argues that, even if the Agreement did not contemplate lobbying, the parties' post-agreement conduct worked a modification of the Agreement.

### 1.  The Agreement is Unambiguous

"The primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement."  *Compagnie Financiere CIC L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000); *see also United States v. Hernandez*, 404 F. App'x 521, 522 (2d Cir. 2010) (summary order) ("The primary judicial purpose is to ascertain and give effect to the parties' intent as reflected in the language of the agreement.").  "Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous."  *Compagnie Financiere*, 232 F.3d at 157.  "The question of whether the language of a contract is ambiguous is a question of law to be decided by the Court."  *Id.* at 158.  Ambiguity is "defined in terms of whether a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way."  *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008).  The "reasonably intelligent person" is deemed to be "cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  *Sayers v. Rochester Tel. Corp. Supplemental Mgm't Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993).

"It is the primary rule of construction of contracts that when the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and the parties' reasonable expectations."  *Howard v. Howard*, 292 A.D.2d 345, 345 (2d Dep't 2002).  "Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing."  *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990).  That said, in analyzing contractual text, a court need not turn a blind eye to context.  Rather, "a court should accord [contractual] language its plain

meaning giving due consideration to 'the surrounding circumstances [and] apparent purpose which the parties sought to accomplish.'" *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990) (quoting *William C. Atwater & Co. v. Panama R.R. Co.*, 246 N.Y. 519, 524 (1927) (second alteration in original)). "A written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties." *Acumen Re Mgmt. Corp. v. Gen. Sec. Nat'l Ins. Co.*, No. 09 Civ. 1796 (GBD), 2012 WL 3890128, at *5 (S.D.N.Y. Sept. 7, 2012) (citation omitted).

At the summary judgment stage, "[t]he mere assertion of an ambiguity does not suffice to make an issue of fact." *Thompson*, 896 F.2d at 721; *see also Sayers*, 7 F.3d at 1095 ("Parties to a contract may not create an ambiguity merely by urging conflicting interpretations of their agreement."). "Thus, the court should not find the contract ambiguous where the interpretation urged by one party would 'strain [] the contract language beyond its reasonable and ordinary meaning.'" *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (quoting *Bethelem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459 (1957)). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation, unless each is a 'reasonable' interpretation." *Id.* (internal citations omitted).

Generally, summary judgment is appropriate in a contract dispute only where the contract's terms are unambiguous, whereas "interpretation of ambiguous contract language is a question of fact to be resolved by the factfinder." *Compagnie Financiere*, 232 F.3d at 158. However, summary judgment is also appropriate "when the [contract] language is ambiguous and there is relevant extrinsic evidence, but the extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law." *Nycal Corp. v.*

*Inoco PLC*, 988 F. Supp. 296, 299 (S.D.N.Y. 1997) (Kaplan, J.); *see also 3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 746–47 (2d Cir. 1999) ("[T]he court may resolve ambiguity in contract language as a matter of law if the evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide the contrary."). Similarly, if there is *no* extrinsic evidence bearing on the parties' intentions, the proper interpretation of ambiguous contract language is an issue for the court. *See Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 116 (2d Cir. 1994); *Williams & Sons Erectors, Inc. v. S.C. Steel Corp.*, 983 F.2d 1176, 1184 (2d Cir. 1993).

In this instance, the Court need not wade into the extrinsic evidence bearing on the parties' intentions, because the Agreement's terms yield only one reasonable interpretation:  The Agreement does not cover lobbying.  The heart of the Agreement lies in its first two sentences:

> This will confirm our conversation concerning our proposed representation of [Peabody] in its efforts to obtain refunds and/or savings [] of excise taxes paid by it upon sale of coal for exportation.  This representation may include applying to the Internal Revenue Service for refund and abatement of the excise tax, filing suit against the United States in the U.S. Court of Federal Claims, and whatever other action before the IRS, or in the federal trial or appellate courts, we may deem necessary or advisable in order to obtain and maximize the refunds being sought.

Agreement at 1.  Lobbying is not listed among the list of specific activities included within the scope of Coudert's representation.  To be sure, the list of enumerated activities is explicitly exemplary and does not purport to be all-encompassing—the list is preceded by the term "may include."  But, significantly, the enumerated activities all take place before the IRS or the federal courts.  The succeeding clause hammers home the point.  It specifies that, apart from the enumerated activities, the agreement reaches "whatever other action *before the IRS, or in the federal trial or appellate courts*, we may deem necessary."  *Id.* (emphasis added).  Read together, these two clauses limit the fora of Coudert's advocacy to the IRS and the federal trial or

appellate courts.  Implicitly but clearly, they exclude Congress, the focus of Baker's years-later lobbying efforts.

This reading is confirmed by various other provisions in the Agreement, which uniformly reflect that the Agreement is addressed to litigation.  For example, the header to the Agreement reads:  "Constitutional Challenge to Coal Excise Tax."  Agreement at 1.  Coudert's fee is to be based on the gross refunds obtained in "a final favorable decision by *the IRS or the courts*."  *Id.* (emphasis added).  Coudert's expected disbursements are limited to "normal photocopying, telecommunications, and filing fees *in court*."  *Id.* (emphasis added).  And Peabody may cease the representation by instructing Coudert "to seek settlement and/or withdrawal of any and all claims and/or cessation of any *litigation*."  *Id.* (emphasis added).   No provision in the Agreement, even implicitly, can be similarly read to reflect an intention that it reach lobbying.

In arguing that the Agreement is ambiguous, the Plan Administrator seizes on the lack of an explicit *exclusion* for lobbying.  He argues that "if the services were not excluded, [] they are included," Tr. 23, and that the Agreement therefore "includes anything that would [be] within the bounds of legality," *id.* at 24.  Thus, the Plan Administrator argues, a reasonable person could interpret the Agreement to include lobbying services.

This argument "strain[s] the contract language beyond its reasonable and ordinary meaning."  *Bethelem Steel*, 2 N.Y.2d at 459.  Although the expression "may include" by itself is not a limiting clause, that clause does not exist in isolation.  As noted, the fora that the Agreement lists for the enumerated activities all involve litigation, before the IRS or the federal courts.  Pivotally, the ensuing catch-all clause *is* one of limitation.  It sets out the requirement for non-enumerated activities by Baker to be covered—that they be "before the IRS, or in the federal trial or appellate courts."  Furthermore, the notion—necessary to the Plan Administrator's thesis

that the Agreement tacitly embraces lobbying—that the Agreement entitled Baker to a 15%

contingency fee for literally any lawful activity resulting in a tax "refund or savings" is

implausible.  This construction, improbably, would have entitled to Baker to such a fee,

potentially, for any political activism that could be said to have led to the success of the refund

cause: *e.g.*, political advertising, debate-coaching for a supportive candidate, or non-issue-related

opposition research aimed at unseating resistant legislators.  Moreover, a contingency fee for

lobbying would raise imponderable questions of causation.  In contrast to the litigation context,

where a plaintiff's success (in the form of a verdict or court ruling) is directly attributable to the

efforts of his or her attorney, the credit for any legislative victory before Congress is necessarily

more diffuse.  In a city full of lobbyists, interest groups, congressional staffers, other purveyors

of influence, and the media, it may well be open to debate—or an unanswerable metaphysical

question—whose efforts caused the passage of particular legislation.  This tends further to

undermine the Plan Administrator's notion that the parties tacitly agreed that Peabody would pay

a contingency fee for lobbying services if refund legislation passed.

That the Agreement does not reach beyond litigation activities before the IRS or in the

federal courts is also reinforced by the nature of the Agreement: an attorney-client engagement

agreement which includes a contingent fee for services.  As noted, for purposes of determining

whether there is ambiguity, the relevant perspective is that of a reasonably intelligent person

"cognizant of the customs, practices, usages and terminology as generally understood in the

particular trade or business."  *Sayers*, 7 F.3d at 1095.  Here, the particular trade or business is

legal services.  A person with a working knowledge of legal ethics knows, or should know, that

the terms of a contingent fee agreement must be clearly stated to the client in writing.  *See* Rule

1.5(c), Rules of Professional Conduct, N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.0; *see also*

*Shaw v. Mfrs. Hanover Trust Co.*, 68 N.Y.2d 172, 176 (1986) ("The importance of an attorney's clear agreement with a client as to the essential terms of representation cannot be overstated. The client should be fully informed of all relevant facts and the basis of the fee charges, especially in contingent fee arrangements.").[8]

Where, as here, a contingent fee agreement lists the type of legal services to be provided, and makes no mention of another type of services, the contract cannot be reasonably interpreted to encompass the omitted, non-legal services. *See Kasowitz, Benson, Torres & Friedman, LLP v. Duane Reade*, 98 A.D.3d 403, 406 (1st Dep't 2012) (agreement entitling attorney to contingency fee for success in underlying litigation cannot be interpreted also to entitle attorney to a share of client's revenues from contract made possible by underlying litigation). If Coudert had wanted to ensure that it would receive a contingency fee based on its lobbying work, it should have explicitly included a provision to that effect in the Agreement. *See id.* ("An omission or even a mistake in a contract does not constitute an ambiguity."); *see also In re Stock Exch. Options Trading Antitrust Litig.*, No. 99 Civ. 0962 (RCC), 2005 WL 1635158, at *6 (S.D.N.Y. July 8, 2005) ("There is a difference [] between contractual language that is ambiguous and a contractual provision that simply omits certain language."); *Millgard Corp. v. E.E. Cruz/Nab/Fronier-Kemper*, No. 99 Civ. 2952 (LBS), 2003 WL 22741664, at *3 (S.D.N.Y. Nov. 18, 2003) ("Since an omission of a term does not itself create an ambiguity, the contract must be

---

[8] The Plan Administrator argues that *Shaw* and its progeny do not undermine its case, because *Shaw* "does not require this Court to ignore extrinsic evidence with regard to the intent of the parties but merely sets up a presumption that can be rebutted by extrinsic evidence." Pl. Br. 12. It is correct that *Shaw* merely sets up a rebuttable presumption in favor of the client's interpretation of an engagement agreement. *See Fredericks v. Chemipal*, No. 06 Civ. 966 (GEL), 2007 WL 1310160, at *5 (S.D.N.Y. May 3, 2007) (Lynch, J.). But the *Shaw* presumption applies only where the court first finds ambiguity in the agreement, *see Shaw*, 68 N.Y. 2d at 177; *Fredericks*, 2007 WL 1310160, at *5, and the Court has not found ambiguity here. The Court instead relies on *Shaw* only insofar as it requires clarity in contingent fee agreements.

understood in light of the terms actually expressed within it."); *Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004) ("[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." (citation omitted)); *Reiss v. Financial Performance Corp.*, 97 N.Y.2d 195, 199 (2001) (contract's failure to address a contingency does not create an ambiguity where contract's terms were otherwise unambiguous).

Finally, although not necessary to the outcome, the undisputed historical fact that, at the time the Agreement was signed, Becker was not, and never had been, a lobbyist reinforces that it does not reach lobbying. *See* Becker Dep. 22–24; Dkt. 50–51. Although it is a "generally accepted proposition that where the terms of a writing are plain and unambiguous, there is no room for interpretation or construction[,] . . . this formulation may be technically overbroad." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 404 (2d Cir. 2009) (Sack, J., concurring) (quoting Richard A. Lord, 11 Williston on Contracts § 30:4 (4th Ed. 2008)). Because the initial determination of whether a contract is ambiguous involves an assessment of the contract's meaning, "[a]t least some principles of interpretation . . . ordinarily guide the inquiry into whether a contract term is ambiguous." *Id.* at 404–05. These principles include the rule that courts "determine ambiguity by 'examin[ing] the entire contract and consider[ing] the relation of the parties and the circumstances under which it was executed.'" *Id.* at 405 (quoting *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998)); *Thompson*, 896 F.2d at 721. Put differently, a court may consider the factual circumstances surrounding the execution of a contract, because the court's primary purpose in interpreting the agreement is to determine the parties' intentions, and interpreting the contract's terms in a factual vacuum would undermine that goal. *See Utica City Nat'l Bank v. Gunn*, 222 N.Y. 204, 208 (1918) (Cardozo, J.) ("To ascertain the meaning of this

contract, we must recall the surrounding circumstances, . . . [which] may stamp upon a contract a popular or looser meaning."); *see also Fla. E. Coast Ry. Co. v. CSX Transp., Inc.*, 42 F.3d 1125, 1129 (7th Cir. 1994) ("Although unambiguous contract language must indeed be interpreted without resort to extrinsic evidence, it is not to be interpreted in a vacuum.  A court's underlying goal when interpreting a contract must always be to ascertain the intent of the parties. . . .  [T]he language of a contract cannot be properly understood if it is read without attention to the circumstances under which it was written."); *Express Blower, Inc. v. Earthcare, LLC*, 410 F. App'x 742, 748 (5th Cir. 2010) ("We do not interpret contracts in a vacuum, but rather in a context that makes sense."); Restatement (Second) of Contracts § 202 (1981) ("When the parties have adopted a writing as a final expression of their agreement, interpretation is directed to the meaning of that writing in the light of the circumstances. . . . The circumstances for this purpose include the entire situation, as it appeared to the parties.").  *Cf. Ottley v. Sheepshead Nursing Home*, 688 F.2d 883, 889 (2d Cir. 1982) ("If, however, we confine the arbitrator to mechanically interpreting contracts in a vacuum, we critically hinder his ability to achieve these goals."); *United States v. Klinger*, 199 F.2d 645, 648 (2d Cir. 1952) (Hand, J.) (when interpreting a writing, "what we do, and must do, is to project ourselves, as best we can, into the position of those who uttered the words, and to impute to them how they would have dealt with the concrete occasion"), *aff'd*, 345 U.S. 979 (1953).  That Becker was not in the lobbying line of work at the time Peabody retained his services confirms that the parties did not intend the contingency-fee agreement to cover such work.

       In sum, by its plain language, the Agreement does not reach lobbying services.  The Plan Administrator's valiant efforts to find ambiguity cannot create it where it does not exist.  A reasonably intelligent person, familiar with basic legal ethics, could not reasonably interpret the

25

Agreement as covering lobbying work.  *Thompson*, 896 F.2d at 721; *Sayers*, 7 F.3d at 1095; *Law Debenture Trust*, 595 F.3d at 467.

### 2.   The Agreement Was Not Modified

Under New York law, it is "[f]undamental to the establishment of a contract modification [that] proof of each element requisite to the formulation of a contract" be shown.  *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003) (quoting *Beacon Terminal Corp. v. Chemprene, Inc.*, 75 A.D.2d 350, 354 (2d Dep't 1980) (first alteration in original).  This includes mutual assent to the contract's terms.  *Id.*; *see also Becker v. Faber*, 280 N.Y. 146, 147 (1939) ("A contractual obligation may not be altered without the consent of the person who has assumed the obligation.").  "[F]or a course of performance to demonstrate mutual assent to a modification, it must be 'unequivocally referable' to the modification."  *Dallas Aerospace*, 352 F.3d at 783 (quoting *Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 343 (1977)).

To prove a modification of an attorney-client agreement, "the burden is on the attorney to establish that the client acquiesced in the agreement 'with full knowledge of all the material circumstances known to the attorney,' and that such acquiescence was not brought about by fraud on the attorney's part, or misconception on the part of the client."  *King v. Fox*, 7 N.Y.3d 181, 190 (2006) (quoting *Greene v. Greene*, 56 N.Y.2d 86, 92 (1982)); *see also Mar Oil, S.A. v. Morrissey*, 982 F.2d 830, 838 (2d Cir. 1993).  New York courts view midstream modifications to fee agreements with particular scrutiny.  *See Naiman v. N.Y. Univ. Hosps. Ctr.*, 351 F. Supp. 2d 257, 263 (S.D.N.Y. 2005); *Baye v. Grindlinger*, 78 A.D.2d 690, 690 (2d Dep't 1989) ("The rule is well established that as to contracts between an attorney and his client subsequent to employment which are beneficial to the attorney, it is incumbent on the attorney to show that the terms are fair and reasonable and fully known and understood by the client." (citation omitted));

*In re Howell*, 215 N.Y. 466, 472 (1915) (attorney-client agreements modified during course of representation will be "carefully scrutinized").

In his deposition, Becker acknowledged that no document specifically amends the Agreement.  Becker Dep. 19–21, 25.[9]  Nevertheless, the Plan Administrator argues, "there are a multitude of documents reflecting [lobbying] work which can be considered written documents reflecting such amendment or modification."  Pl. 56.1 ¶ 13.  Although the Plan Administrator does not point to any particular document, a brief review of the best candidates to effect such a modification reveals that none is sufficient to create a genuine issue of material fact as to modification.  That is particularly so given the background principle, noted earlier, that the terms of a contingent fee arrangement must be clearly set forth in writing.  *See Shaw*, 68 N.Y.2d at 176 ("The client should be fully informed of all relevant facts and the basis of the fee charges, especially in contingent fee arrangements.").

On November 22, 2005, Baker emailed a completed form to Peabody accountant Maher for his review.  *See* Becker Decl. Ex. E at 0007219.  The form, which incorporated data that Maher had supplied, indicated that Baker intended to register as a lobbyist for Peabody.  That spare form, however, cannot plausibly be termed a modification.  It did not set forth, or purport to set forth, the modified terms of an agreement (*i.e.*, that lobbying services would be compensated pursuant to the contingency arrangement in the Agreement).  That the person at Peabody who assisted in the preparation of the lobbying form was an accountant—whereas the Agreement had been entered into by Peabody's Chief Legal Officer, Klinger—also undermines the notion that that form worked a modification.

---

[9] The Agreement does not contain a provision regarding modification.

On January 19, 2006, Palmer emailed Becker to express Peabody's support for the Emerald Bill. *See id.* at 0007230. But nothing in Palmer's guarded terms ("Peabody supports your efforts and you may so state") could be construed as a ratification of a modified agreement adding lobbying services to those for which Peabody had committed to pay a contingency fee. Nor did Becker's prior email set out terms of a modified agreement.

On February 4, 2008, Leahy emailed Becker, asking him to "pls assist" in formulating arguments in support of the bill. *See id.* at 0007347. That email can fairly be viewed as a request by Peabody for Becker's services. However, nothing in that email, nor in Becker's emails before or after, set out the terms upon which that assistance would be provided, incorporated the 1997 Agreement by reference, or purported to modify it. That the lobbying efforts requested, or acquiesced in, by Peabody sought the same goal as the litigation efforts—a refund for taxes paid covering 1991–1994—does not, without more, work a modification of the parties' Agreement providing for contingency fees only for litigation work.

The Plan Administrator, finally, emphasizes Klinger's admissions that, at a number of points, he knew about Baker's lobbying activities and did not tell Baker to stop. *See* Pl. Br. 14–15 (quoting Klinger Dep. 42–43, 55, 57, 59). The evidence indeed shows that Becker performed substantial lobbying activities and that Peabody was aware of these activities. And, from the perspective of the Plan Administrator's quasi-contract claims, addressed *infra*, it may well be consequential that neither Klinger nor any other Peabody official was more explicit—at least before Palmer's April 18, 2008 email and phone call—in telling Becker that Peabody did not wish to employ Baker's lobbying services. But Peabody's inaction does not itself make out the elements of a modification. Klinger may well have acquiesced in Baker's work, but such acquiescence is not tantamount to an agreement that such work would be compensated pursuant

28

to the 1997 contingency agreement covering litigation work.  And the Plan Administrator's emphasis on Peabody's inaction wrongly shifts the burden of proving a contract modification to the client, when it properly rests on the attorney.  *See King*, 7 N.Y.3d at 190; *see also Data-Stream AS/RS Techs., LLC v. China Int'l Mar. Containers, Ltd.*, No. 02 Civ. 6530 (JFK), 2004 WL 830062, at *6 (S.D.N.Y. Apr. 13, 2004) (client's failure to tell attorney to stop working before exceeding a previously agreed upon cap on fees does not constitute a modification; attorney bears burden of either staying within the cap or executing a written modification).  *Cf. Kasowitz, Benson, Torres & Friedman v. Duane Reade*, 939 N.Y.S.2d 741 (Table), at *8 (N.Y. Sup. Ct. 2011) ("Even if the litigation strategy shifted after this point, [the attorney] should have redrafted the contingency fee agreement to acknowledge this shift."), *aff'd*, 98 A.D.3d 403. Peabody's knowing acceptance of Baker's services is relevant instead to the Plan Administrator's quasi-contract claims.[10]

For these reasons, summary judgment is merited in favor of Peabody on the Plan Administrator's contract claim.

### B.  Quasi-Contract Claims

The Plan Administrator also brings quasi-contract claims for unjust enrichment and quantum meruit.  "To prevail on an unjust enrichment claim under New York law, a plaintiff must establish: (1) that the defendant benefited; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."  *Price v. Cushman & Wakefield, Inc.*, 829 F. Supp. 2d 201, 217 (S.D.N.Y. 2011) (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)).  "[T]o recover in quantum meruit, New York law requires a claimant to establish (1) the performance of

---

[10] Nor does Peabody's conduct suffice, as the Plan Administrator urges, *see* Pl. Br. 19, to constitute waiver or estoppel.  *See Dallas Aerospace*, 352 F.3d at 783; *Landmark Ins. Co. v. Hensam Enters., Inc.*, No. 10 Civ. 4450 (GBD), 2011 WL 3366483, at *6–7 (S.D.N.Y. July 29, 2011) ("A waiver cannot be inferred from mere silence or inaction.").

services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Revson v. Cinque & Cinque*, 221 F.3d 59, 69 (2d Cir. 2000).

Although unjust enrichment and quantum meruit have nominally different elements, courts in this circuit analyze them as a single quasi-contract claim for restitution. *See Mid-Hudson Catskill v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2004) (Sotomayor, J.); *Newman & Schwartz v. Asplundh Tree Expert, Co.*, 102 F.3d 660, 663 (2d Cir. 1996); *Shelton v. Sethna*, No. 10 Civ. 2148 (TPG), 2012 WL 1022895, at *7 n.4 (S.D.N.Y. Mar. 26, 2012).

### 1. The Agreement Does Not Bar the Quasi-Contract Claims

The Court first addresses Peabody's threshold argument that the Plan Administrator's quasi-contract claims are barred under New York law. "The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (1987). "It is impermissible . . . to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties." *Id.* at 389; *see also MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 157 F.3d 956, 964 (2d Cir. 1998). Where "the contingent fee arrangement is found to have specifically covered the situation at hand, either by entitling or not entitling [the attorney] to a contingent fee, a quantum meruit claim cannot survive." *Fredericks*, 2007 WL 1310160, at *6 (citing *Goldman v. Metro Life Ins. Co.*, 5 N.Y.3d 561, 572 (2005)). However, "[t]he principle of *Clark-Fitzpatrick*, while broad, is subject to exceptions[,]" including where "a party has rendered additional services upon extra-contractual representations by the other party." *U.S. E.*

*Telecomms., Inc. v. U.S. W. Comms. Servs., Inc.*, 38 F.3d 1289, 1298 (2d Cir. 1994); *see Clark-Fitzpatrick*, 70 N.Y.2d at 389.

Peabody argues that the parties' Agreement covers the scope of the dispute and, under *Clark-Fitzpatrick*, therefore forecloses the Plan Administrator's quasi-contract claims.  Def. Br. 20–21.  But this Court has already found, in Peabody's favor, that the Agreement unambiguously does *not* reach lobbying activities.  Thus, the scope of the Agreement does not "clearly cover[] the dispute between the parties."  Accordingly, the Plan Administrator's quasi-contract claims are not barred.  *Clark-Fitzgerald*, 70 N.Y.2d at 389.

Resisting this conclusion, Peabody seeks to frame the Agreement differently—as having governed *all* services to be performed and having exhaustively set out Peabody's duty to pay Baker for services rendered.  Because lobbying was not among the services to be performed, Peabody argues, the Agreement "covers the dispute" by not providing any fee for those services. *See* Def. Reply Br. 7 (citing *Fredericks*, 2007 WL 1310160, at *6).  But *Fredericks* does not assist Peabody—quite the contrary.  There, an attorney sued his client to recover a contingency fee for services rendered at the trial level.  The court found that the terms of the attorney-client agreement did not entitle the attorney to recovery—the agreement provided for a contingency fee for a trial verdict, but the client had lost at trial and settled the case while on appeal.  *Fredericks*, 2007 WL 1310160, at *5–6.  The Court further held that the agreement barred the attorney's quantum meruit claim for services rendered at the trial level, because the sole terms under which compensation for those services would be rendered had been set out in the agreement.  *Id.* at *6.  However, the attorney had also provided some consulting services for the client on appeal, even though the fee for such services had not been specified in the agreement.  Because the attorney's right to fees for his appellate work was not "the particular subject matter of the agreement," the

court found that it was an open question "whether [the attorney] could be entitled to a quantum meruit recovery for the services he claims to have performed in connection with the appeal." *Id.* at 7.[11]

Here, the Agreement specifically entitles Baker to a percentage of Peabody's recovery based on "a final favorable decision by the IRS or the courts and in accordance with such final favorable decision." Agreement at 1. Had Baker brought a quasi-contract claim based on its litigation work—the "particular subject matter" of the agreement—that claim would be squarely barred under *Clark-Fitzpatrick*, much like the trial work by the attorney in *Fredericks*. But what the Plan Administrator seeks to recover for in quasi-contract are *lobbying* services. This claim is akin to the attorney's claim for appellate-stage consulting fees in *Fredericks*, because such work and the fees for it were similarly unaddressed in the parties' agreement. 2007 WL 1310160, at *6; *see also Baker v. Robert I. Lappin Charitable Found.*, 415 F. Supp. 2d 473, 485 (S.D.N.Y. 2006) (Chin, J.) (agreement between parties does not bar quasi-contract claim where agreement's terms are unclear as to payment for a particular service).

Furthermore, the summary judgment record reflects a number of representations by Peabody to Baker that a jury could reasonably construe as requests for lobbying services. *See, e.g.*, Becker Decl. Ex. E at 0007233 (January 25, 2006 email from Palmer to Becker, requesting a memo updating him on lobbying efforts); *id.* at 0007334 (February 4, 2008 email from Leahy to Becker, requesting assistance with formulating arguments in favor of proposed legislation). Those requested services unambiguously fall outside the scope of the Agreement. The Plan Administrator's claim for payment in quasi-contract on account of those services is not barred under *Clark-Fitzgerald*. *See U.S. E. Telecomms.*, 38 F.3d at 1298 (plaintiff may recover in

---

[11] The court nevertheless dismissed the attorney's quantum meruit claim on this issue as improperly pled. *Fredericks*, 2007 WL 1310160, at *7.

quantum meruit for services outside of those contemplated in the contract, where those services were rendered in reliance on extra-contractual representations by the defendant); *see also Mid-Hudson Catskill*, 418 F.3d at 175–76 ("[A] plaintiff's entitlement to recover in quantum meruit outside of a valid contract may depend on a showing that the additional services are so distinct from the contractual duties . . . that it would be unreasonable for the defendant to assume that they were rendered without expectation of further pay." (citation and original alterations omitted)).

### 2.  A Genuine Factual Dispute Exists as to the Plan Administrator's Quasi-Contract Claims

As noted, it is undisputed that Baker lobbied in support of refund legislation and that Peabody knew of at least some of these activities.  To be sure, Peabody may dispute whether Baker's lobbying efforts on its behalf were responsible for or meaningfully contributed to the passage of the EIEA and hence Peabody's refund.[12]  *See* Palmer Dep. 30.  But on the record before the Court, a jury could certainly find both that Baker's lobbying efforts benefited Peabody in *some* way and that Peabody knowingly accepted at least some of those benefits.

Further, a jury could find that the volume of lobbying work that Baker performed for Peabody is sufficiently large as to defeat the claim that these services were incidental or *gratis*. Whether Baker's lobbying work for Peabody is measured in terms of hours recorded on the firm's internal time entries—a brief review of the billing records provided suggests that it is in

---

[12] The Court does not have occasion to consider whether, at trial on the quasi-contract claims, the passage of the EIEA and Peabody's receipt of the refund would be admissible.

the ballpark of 80 hours,[13] *see* Becker Decl. Ex. D—or by the frequency of communication and collaboration between Baker and Peabody, *see* Part I(E), *supra*, it is consequential.

The dispositive issue, using the language of quantum meruit, is, therefore, whether Baker performed these services in good faith with an expectation of compensation. *See Revson*, 221 F.3d at 69.[14]  Based on the record evidence, the Court finds that there is a genuine issue of material fact as to whether, and if so during what period, Baker, in performing lobbying services for the benefit of Peabody, reasonably expected compensation for those services.

Baker's lobbying efforts began, at the earliest, in fall 2003.  *See* Becker Decl. ¶ 14; *id.* Ex. D at 000130 (September 17, 2003 billing entry); *id.* Ex. E at 0007177 (November 10, 2003 email from Becker to Klinger).  Baker's efforts ended, at the latest, upon the passage of the EIEA in October 2008.

Within this five-year time frame, however, there are various dates which a jury could find bookended the period, if any, during which Baker had a reasonable expectation of compensation from Peabody for its lobbying work.[15]

---

[13] When asked at argument about the number of hours billed, Peabody's counsel gave a "seat-of-the-pants" estimate of less than $50,000–$100,000 of time.  *See* Tr. 19.  The Plan Administrator's counsel—stating that the value was substantially higher—responded that Peabody's counsel "wears very short pants."  *Id.* at 30.

[14] Framed in terms of unjust enrichment, the issue is whether "'equity and good conscience' require restitution."  *Kaye*, 202 F.3d at 616.  However the elements are described, the analysis is substantially the same.  *See Mid-Hudson Catskill*, 418 F.3d at 175.

[15] Conceivably, recovery for the Plan Administrator's claims may also be limited by the statute of limitations.  *See Scott v. Rosenthal*, No. 97 Civ. 2143 (LLS), 2001 WL 968992, at *8 (S.D.N.Y. Aug. 24, 2001) (citing N.Y. C.P.L.R. § 213(2)) (six years); *Eisen v. Feder*, 763 N.Y.S.2d 279, 280 (1st Dep't 2003) (same).  *But see Ross v. Thomas*, No. 09 Civ. 5631 (SAS), 2010 WL 3952903, at *5 (S.D.N.Y. Oct. 7, 2010) (collecting New York cases applying three- and six-year statute of limitations to unjust enrichment claims).

For instance, Baker's reasonable expectation of such compensation might have arisen as soon as its lobbying services began.  Alternatively, Baker's expectation may not have arisen until November 2005, when it prepared a lobbying form on Peabody's behalf, *see* Becker Decl. Ex. E at 0007219, or until it filed that form in February 2006, *see* Scher Decl. Ex. R.  Conceivably, a jury might find that Baker's expectation arose on January 19, 2006, when Palmer told Becker that Peabody supported his lobbying efforts, *see* Becker Decl. Ex. E at 0007230, and when Palmer requested a memo updating him on the legislative effort, *see id.* at 0007233.  Or a jury might find that Baker never had a reasonable expectation of compensation *from Peabody* for its lobbying work.

Similarly, assuming that a reasonable expectation of compensation for lobbying work ever arose, there are numerous dates on which Peabody might be found to have "called off the dogs"—*i.e.*, communicated to Baker that it no longer authorized lobbying services on its behalf—and after which Baker therefore could not have reasonably expected compensation.  There can be no dispute that, after April 18, 2008, Baker could not have reasonably expected to receive payment *from Peabody* for any lobbying services.  The undisputed evidence is that, on that date, Palmer emailed Becker and stated, in no uncertain terms, that lobbying services were no longer requested.  *See* Scher Decl. Ex. P ("[O]ur Washington effort will proceed anyway with no additional resources needed nor requested.").  Becker himself testified that he viewed this as an attempt by Peabody to avoid paying Baker for lobbying work, *see* Becker Decl. ¶ 28; *see also* Scher Decl. Ex. P (Becker email to Horowitz), and there is no evidence that Peabody later, explicitly or implicitly, countermanded this directive.

Before April 18, 2008, however, there are numerous events or communications that a jury could potentially find put an end to any reasonable expectation of payment by Baker.  Palmer

testified that, on January 18, 2006, he told Becker that he was not to lobby on Peabody's behalf, *see* Palmer Dep. 44; although Becker disputes that testimony, *see* Becker Dep. 102, a jury could choose to credit Palmer's account.  Alternatively, Leahy's March 11, 2007 email, *see* Scher Decl. Ex. M at 000907 ("You are free to represent other coal companies but not Peabody regarding this issue."), could be viewed as having terminated any reasonable expectation by Baker that it would be paid by Peabody for its lobbying services, depending on which party's characterization of the email the jury credited.  *Compare* Pl. Br. 23, *with* Def. Reply Br. 8.

Because there exists a genuine issue of material fact as to whether, and if so during which period, Baker had a reasonable expectation of payment from Peabody for lobbying services, summary judgment is inappropriate on Baker's quasi-contract claims.[16]  Those claims must proceed to trial.

### CONCLUSION

For the foregoing reasons, Peabody's motion for summary judgment is granted as to the Plan Administrator's contract claim, but denied as to the Plan Administrator's quasi-contract claims.  The Clerk of Court is directed to terminate the motion pending at docket number 35.

The next conference in this case is scheduled for February 14, 2013, at 4:00 p.m in Courtroom 1305 at the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, New

---

[16] Peabody also argues that the Plan Administrator's quasi-contract claims are foreclosed by two admissions by Baker: first, Baker's failure to include any mention of contingency fees in the February 17, 2010 response to Peabody's audit inquiry, *see* Scher Decl. Ex. U, and Baker's failure to report more than $70,000 in total lobbying fees on its periodic lobbying forms, *see id.* Ex. R.  Def. Br. 18–19, 22; Def. Reply Br. 3–6.  The Plan Administrator disputes that either the audit response or the lobbying forms required Baker to list its entitlement to fees for lobbying. *See* Pl. Br. 20–21, 24; Pl. 56.1 ¶¶ 72–78, 82–84.  Although Baker's responses to the audit inquiry and the lobbying forms may be relevant—perhaps quite probative—evidence at trial as to whether Baker had an expectation, let alone a reasonable one, of payment, they are an insufficient basis for granting summary judgment for Peabody on those claims.

York 10007. At that conference, the Court expects to set a trial date. For planning purposes, counsel are advised that the Court presently expects trial to commence in early April 2013.

Counsel are directed to meet and confer before the conference, and to jointly submit a letter to the Court no later than February 11, 2013. The letter should state whether both parties believe a settlement conference soon with the Court would be productive; the letter should not reveal any differing views between the parties on that point. The letter should also set forth the parties' respective views on the following, assuming that the case is to proceed to trial, in addition to any other issues that either party wishes to raise:

1. How long will a trial last?

2. What pretrial motions do the parties anticipate?

3. Are there issues whose resolution substantially before trial might promote settlement (*e.g.*, relating to the method of calculating damages on the quasi-contract claims; the admissibility of the fact that efforts to secure a refund through legislation ultimately proved successful; or the application of the statute of limitations to the Plan Administrator's claims)?

SO ORDERED.

_Paul A. Engelmayer_
Paul A. Engelmayer
United States District Judge

Dated: January 30, 2013
       New York, New York